GRAZIELLA LOWELL
*vs.*
MAINE EMPLOYMENT SECURITY COMMISSION, ET AL.

Kennebec.    Opinion, April 22, 1963.

*Fales and Fales,*
by *Roscoe H. Fales,* for the Plaintiff.

*Frank A. Farrington, Asst. Atty. Gen.,*
*Milton L. Bradford, Asst. Atty. Gen.,* for the Defendants.

SITTING: WILLIAMSON, C. J., SIDDALL, SULLIVAN, MARDEN,
JJ.    WEBBER AND TAPLEY, JJ., dissenting.

WILLIAMSON, C. J. This is an appeal from a decree of the Superior Court sustaining a decision of the Maine Employment Security Commission disqualifying the appellant claimant from benefits under the Employment Security Act. R. S., c. 29.

In our consideration of the appeal we are governed, as was the Superior Court, by Sec. 16-IX, reading in part:

> "In any judicial proceeding under this chapter, the findings of the commission as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of said court shall be confined to questions of law."

> "The Commission's findings of fact, when supported by any credible evidence, are conclusive. Judicial review is limited to the correction of errors of law. When the Commission decides facts contrary to all of the credible evidence in the case, it has committed an error of law. . . When no dispute as to the facts exists or is possible upon all the evidence, the question becomes one of law." *Dubois et al* v. *M. E. S. C.*, 150 Me. 494, 505, 114 A. (2nd) 359.

The Commission in deciding (with one commissioner dissenting) "that the claimant refused to accept an offer of work for which she was reasonably fitted within the meaning of Section 15-III of the Employment Security Law," adopted the findings of fact of the Appeal Tribunal.

Turning to the record of the Appeal Tribunal, the decision disqualifying the claimant from benefits was based on the following findings of fact:

> "The claimant is a woman, 57 years of age, unemployed at the time of hearing (June 8, 1961). She last worked in a local shoe manufacturing establishment (defendant Wood & Smith Shoe Co.) as a repairer up to March 24, 1961, when she was separated due to lack of work. On this job

her average earnings on piece rates were $50 to $55 a week.

"She filed initial application for employment security benefits in the current benefit year, effective April 2, 1961. She thereafter reported and filed weekly claims.

"On May 18, 1961 the claimant was referred to a local shoe shop (Belgrade Shoe Co.) for work as a repairer at an hourly rate of $1.25. The claimant contacted the employer, discussed the job, but did not accept as she preferred to wait until she might be recalled by a former employer. With this former employer as a repairer, she had worked on piece rate and claims to have earned well over $1.25 an hour. As of the date of hearing the claimant had expectations of returning to this former employer sometime in the early part of July.

"The claimant is classified occupationally as a blemish remover and inspector (boot and shoe industry.)"

In the record of the evidence taken before the Chief Appeals Referee, we read:

(Referee)

"Q Now — you (claimant) stated here on the 24th day of May: 'I was referred to a job opportunity on 5-18-51. I had an interview for this job on 5-18-61. I talked with the floor lady about the job. The job paid $1.25 an hour. I told the floor lady that I wanted to go back to Clark Shoe to work. She would not hire me when she found out I wouldn't stay if offered work at Clark Shoe. I went to Clark Shoe on 5-23-61. I was told they would call me as soon as work was available.' End of statement. "And — you could have gone to work for Belgrade Shoe as a repairer?

"A Yes, but like I said, they won't hire me for a month or five weeks.

"MRS. LOWELL: (Cont) Like Mrs. Madore told me — when — to fix up you know, the insurance and other things, you know, that there is no sense to it. I got my mind to go to Clark Shoe. I make good money there, I use to make good money - -

"REFEREE MEAGHER: How much did you make an hour there?

A Two or three dollars an hour. You, see, piece work, see? That's why I'm use to make pretty good. That's why I wanted to go back there. You know that when you work most all your life on piece work, you don't feel to work for $1.15 or $1.20. You know, like I do that Clark Shoe is a good place — good over there.

"Q How long have they been closed down now?

"A I use to work at a time at Clark — there was two Clarks — I was in Clark No. 2 when they closed. I was a stretch repairer there.

"Q You haven't worked for Clark Shoe since when?

"A Last November, I think. I think it was November. Or October - -

"Q Well — that's the whole story, is it? As to why you didn't get work - -?

"A Yes, that's the truth."

In the Superior Court "the Defendant stipulated that the statement made by the (claimant) to the prospective employer was without malice on her part, and that she probably did not act as she did, solely for the purpose of preventing a job offer being made."

The claimant urges that no offer of a job was made, and therefore the disqualification for benefits from refusal to accept work under Sec. 15-III was an error of law.

To obtain benefits a claimant must establish; first, eligibility (Sec. 14), and second, that he is not disqualified

(Sec. 15). Under Sec. 14-III it is required that the claimant "is able to work and is available for work."

Sec. 15-III read at the time the case arose in part:

"**Sec. 15. Disqualification for benefits.**—an individual shall be disqualified for benefits:

\* \* \* \* \* \* \* \* \*

"**III. Refused to accept work.** If he has refused to accept an offer of suitable work for which he is reasonably fitted . . . the disqualification shall begin with the week in which the refusal occurred and shall continue for the duration of the period of unemployment during which such refusal occurred.

"**A.** In determining whether or not any work is suitable for an individual, the commission shall consider the degree of risk involved to his health, safety and morals, his physical fitness and prior training, his experience and prior earnings, his length of unemployment and prospects for securing local work in his customary occupation, and the distance of the available work from his residence."

The amendment in Laws 1961, c. 361, § 6 does not affect the case.

We are here concerned with *disqualification* and not *eligibility*. For our purposes the claimant did not lack eligibility under Sec. 14-III. The Commission did not so find. The question is whether the claimant, otherwise being eligible for benefits, became disqualified therefor from refusal to accept suitable work. The Commission placed its decision firmly on disqualification under Sec. 15. *Krauss* v. *A. & M. Karagheusian, Inc.* (N. J.), 100 A. (2nd) 277.

We examine the conditions in Sec. 15-III.

(1) "If he has refused to accept an offer of suitable work." We are satisfied that the finding of a refusal to

accept an offer of work was supported by evidence. Whether the work was "suitable" we will later discuss.

In brief, there was an opening for a repairer at Belgrade Shoe. The job was permanent insofar as any job may be so considered. The claimant was interested in the job only for a few weeks until an opening at Clark Shoe at a higher wage should appear.

With this condition attached, the offer of the job to the claimant was withdrawn. It is entirely accurate to say that Belgrade Shoe made no offer of a job with the condition of severely limited life expectancy attached thereto by the claimant. This, however, does not deny that a job was offered permanent in nature in distinction from temporary employment for a few weeks, and was refused by the claimant.

There is nothing unusual in the situation here disclosed. The claimant simply did not choose to accept a job as a repairer without making known her intention to leave when a hoped for job at higher pay might become open within a few weeks. Under these conditions the Belgrade Shoe lost interest in the claimant and withdrew its offer of a job.

No job is permanent, of course, in an absolute sense. Belgrade Shoe attached no condition to its offer of employment and doubtless would not have been surprised had the claimant given up a job as repairer to return to a former employer at a higher wage. This possibility is quite different from a condition attached to the proposed employment that the claimant presently plans to leave within a few weeks. Understandably the Belgrade Shoe did not wish to employ the claimant under these conditions.

(2) "For which he is reasonably fitted." There is no doubt of the claimant's fitness. She was an experienced repairer.

(3)   Was the work offered "suitable" as measured by Sec. 15-III (A)?   There was no risk to health, safety and morals.   Physical fitness, prior training, experience, and distance of work from her residence did not affect in the slightest the suitability of a repairer's job with Belgrade Shoe in comparison with the repairer's job held in several factories by the claimant.

There are left of criteria to determine whether the Belgrade Shoe job was suitable: (1) prior earnings, (2) length of employment, and (3) prospects for securing local work in her customary occupation, i.e., as a repairer.

The rate per hour offered by Belgrade Shoe was less the claimant says than she expected to earn at piecework with Clark Shoe.   There is no indication that the offered hourly wage was not in line with wages in the industry generally or that it was a depressed wage.   The difference in estimated income was not so great as to make the repairer's job at Belgrade Shoe unsuitable for the claimant.

The claimant had been unemployed since March 24, 1961. The Belgrade Shoe job was refused on May 18, 1961.   The hearing of the Appeals Tribunal, whose findings of fact were adopted by the Commission, was held on June 8, 1961. The claimant then had no more than a hope of employment in early July, not with Wood & Smith Shoe Co., her most recent employer, but with a former employer Clark Shoe.

The Commission was entirely justified in considering the time of unemployment and the prospects for the desired piecework job at Clark Shoe did not render the Belgrade Shoe job unsuitable under the circumstances.

In *Hallahan* v. *Riley* (N. H.), 45 A. (2nd) 886, the New Hampshire Court, noting that mending was skilled work and burling was not, said:

> "It should be pointed out in the first place that the question of the suitability of the work offered in a

given case is one of fact and the determination of that fact in the present case cannot be attacked in this proceeding if it is sustained by competent evidence. The test to be applied in determining suitability of work is not left to speculation." (Stating the criteria found in our Sec. 15-III (A)).

\* \* \* \* \* \* \* \* \*

"In other words, while a woman may be justified in refusing as unsuitable, work offered to her immediately after her separation from her job, the situation may change after the lapse of a considerable time during which she has remained unemployed. Work which was unsuitable at the beginning of her unemployment may become suitable when consideration is given to the length of unemployment and the prospects of securing her accustomed work. Although the applicant may continue to refuse jobs paying a lower rate of compensation, she must do so at her own expense rather than at the expense of the unemployment fund. The cushion of security between jobs provided by the statute was not designed to finance an apparently hopeless quest for the claimant's old job or a job paying equal wages. What length of time should be regarded as sufficient to require this result is again a question of fact with which we have no concern. The statute specifically requires that consideration be given to the factor of length of unemployment. No limitation upon the weight which shall be attached to this factor is to be found in the law."

Cf *Corrado* v. *Director*, 325 Mass. 711, 92 N. E. (2nd) 379.

Availability under Sec. 14-III is interwoven with refusal to accept suitable work under Sec. 15-III. The refusal is a reason for disqualification for benefits of a claimant otherwise eligible and may warrant the inference of non-availability, i.e., that the claimant is no longer genuinely attached to the labor market. It is not necessary, however, in light of the precisely stated ground of the Commission's decision upon disqualification that we consider the question

of availability. Illustrative cases on "availability" presenting analogous situations are: *Goings* v. *Riley* (N. H.), 95 A. (2nd) 137; *Swanson* v. *Minneapolis-Honeywell Regulator Co.* (Minn.), 61 N. W. (2nd) 526; *Corrado* v. *Director, supra; Farrar* v. *Director,* 324 Mass. 45, 84 N. E. (2nd) 540, 543; Annot. 25 A. L. R. (2nd) 1077; 165 A. L. R. 1382.

The purpose of the Employment Security Act was well stated by Justice Brennan, then of the New Jersey Supreme Court and now of the Supreme Court of the United States, in *Krauss* v. *A. & M. Karagheusian, Inc., supra,* at p. 281:

> "The Unemployment Compensation Act provides social insurance, for the common good as well as in the interest of the unemployed individuals, against the distress of involuntary unemployment for those individuals who have ordinarily been workers and would be workers now but for their inability to find suitable jobs. [Cited cases omitted] The provisions for eligibility and disqualification are purposed to preserve the fund for the payment of benefits to those individuals and to protect it against the claims of others who would prefer benefits to suitable jobs. The basic policy of the law is advanced as well when benefits are denied in improper cases as when they are allowed in proper cases."

The claimant chose to refuse an offer of suitable work. The Commission so found on credible evidence. The penalty is disqualification for benefits under the Act.

The entry will be

*Appeal denied.*

WEBBER, J. (DISSENTING)

I reach a contrary result on the undisputed facts. In my view this claimant made herself available for work within the meaning of the statute but was never actually offered employment which she refused. I take it that no one questions that this claimant or any employee not under special contract for a fixed term could leave a job at any time in order to accept other employment. This is an absolute right which this claimant possessed. She could have accepted a job offer at Belgrade knowing that the offer was available only to persons who intended to remain until laid off and she could at the same time have harbored the secret intention of leaving the job the minute a better opportunity presented itself. In effect she would then have been deceiving Belgrade by her silence. I cannot agree that the statute requires deception from one who would qualify for benefits. All that she did was to announce candidly and honestly her intention to retain and exercise the right to leave the job for a better position when and if such a position became available. On the other hand, all that Belgrade had available for her was conditional employment, the condition being that she forfeit or agree not to exercise her right to accept a better job offer. Belgrade had a perfect right to limit its employment opportunities and to hire only persons interested in contracting for a long term, but in so doing it did not make the claimant the kind of an offer that the statute required that she accept. There is no suggestion in the evidence that if an unconditional offer of employment had been made, the claimant would have rejected it. Obviously, if she had done so, she would have forfeited her right to benefits. This is not a case in which the claimant is herself improperly attaching conditions to her acceptance of an unconditional offer of employment. Neither is there any question of her good faith.

In *Reger* v. *Administrator* (1946), 132 Conn. 647, 46 A. (2nd) 844, the claimant was the wife of a serviceman and there was uncertainty as to the length of time she would remain in the area. Many employers were unwilling to offer her employment for this reason. The court said at page 846:

> "The other phase of the question is concerned with the reliance placed by the commissioner in his decision upon the fact of the impermanence of the plaintiff's stay in Ozark. This involves the effect of a person's inability to get work owing to the unwillingness of employers to hire her because of the probable transient or temporary nature of her sojourn in the community, a reason not inherent in the general labor situation. 'Where employers refuse or are reluctant to hire an individual, suitable job opportunities which the individual is qualified to perform and which he is able, willing, and ready to accept may nonetheless exist. Such refusal to hire a worker does not of itself render the work usuitable or prevent him from legally performing the work. Accordingly, refusal of employers to hire married women * * *, individuals beyond a certain age * * *, or members of minority groups * * *, should not render unavailable individuals in any of such groups who are otherwise available. * * * While employers, for what they think is in their best interests, or for any reason, may refuse to hire any worker, such refusal should not affect the availability of workers whom they refuse to hire, unless such refusal is required by law.' Freeman, 55 Yale L.J. 123, 133. That employers would not employ servicemen's wives because of the uncertainty of the length of time they would remain in the area was not a material factor in determining whether the plaintiff was available for work."

I recognize but am not persuaded by a series of cases decided in Pennsylvania in which benefits were refused be-

cause the claimant would not agree to continue the employment if there should be a later recall by a former employer. The court felt that this was indicative of *bad faith* on the part of the claimant. *Baker* v. *Unemployment Comp. Bd. of Review* (1960), 193 Pa. Super. 460, 165 A. (2nd) 103; *Trabold* v. *Unemployment Comp. Bd. of Review* (1960), 191 Pa. Super. 485, 159 A. (2nd) 272.

In the instant case, if Belgrade had offered the claimant employment provided she would execute a written contract to continue in that employment for at least five years unless sooner discharged or laid off by the company, I doubt if it would be seriously contended that a refusal to accept the employment on those terms would bar the claimant from benefits. I see no difference in principle. Although no fixed term was involved, it is apparent that Belgrade was at the moment only interested in hiring persons who would commit themselves in advance to long term employment. This claimant did not belong to the class of employees for whom Belgrade had jobs available at that time. It is for that reason that no offer of employment was made to her which she could either accept or reject. I would sustain the appeal.

TAPLEY, J., joins in this opinion.